**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS CRAWFORD,** | : | |
| | : | **Case No. 2:15-cv-2438** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Kemp** |
| **COLUMBUS STATE COMMUNITY** | : | |
| **COLLEGE,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

Thomas Crawford, an adjunct lecturer of physics and engineering at Columbus State Community College ("CSCC"), sued his employer and several of its high-ranking officials under 42 U.S.C. § 1983. Crawford alleged that those officials failed to promote him to a fulltime tenure track position in retaliation for exercising his First-Amendment right to speech regarding workplace grievances and his anti-abortion views, and also because of his advanced age, in violation of the Equal Protection Clause of the Fourteenth Amendment. CSCC moved to dismiss Crawford's suit under Federal Rule of Civil Procedure 12(b)(6), arguing that he failed to state a claim and that, in any event, the individual officials remain entitled to qualified immunity. Having reviewed the parties' briefing, the Court agrees with CSCC as to Crawford's first claim, which is not based on constitutionally protected speech. The Court agrees with Crawford, however, as to his second and third claims, which both sufficiently state a cause of action upon which relief can be granted. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** CSCC's motion to dismiss (Doc. 24). The Court likewise **GRANTS** Crawford's motion to strike the exhibits that CSCC appended to its motion to dismiss (Doc. 25).

# I. BACKGROUND

## A. Factual Background[1]

Thomas Crawford, aged seventy-two, has served as an adjunct lecturer in the Department of Biological and Physical Sciences at CSCC since 2002. (Doc. 21, ¶¶ 1, 10). Roughly a decade into his employment, Michael Hailu, the Dean of Crawford's department (and a defendant here), asked him to develop a "Fundamentals of Engineering" program. (*Id.* at ¶ 14). Crawford developed the program, which CSCC subsequently offered as two separate courses. (*Id.*). Crawford taught those courses in addition to training other lecturers on how to teach them. (*Id.*).

During the spring of 2013, one of Crawford's students approached him and mentioned the idea of recommending Crawford for a fulltime position due to his "superior teaching and tutoring." (*Id.* at ¶ 15). The student prepared a "recommendation[]" letter for David Harrison, the President of CSCC (and also a defendant in this case), which outlined the case for promoting Crawford. (*Id.* at ¶¶ 15-17). The student's letter also raised concerns over alleged cheating in some physics classes and poor teaching within the department more generally. (*Id.* at ¶ 15). Crawford, who had heard of another student's concerns regarding alleged cheating within the department, "did not dissuade" the student from lobbying school officials for a promotion or from voicing these other concerns. (*Id.*). Later, this student asked Crawford for a copy of his resume, which Crawford provided, and then asked Crawford to review his proposed letter to President Harrison, which Crawford did. (*Id.* at ¶ 16). The student then created a petition to accompany his letter and collected signatures from forty-two other students who also wished to see Crawford promoted. (*Id.* at ¶ 17). The student submitted this petition and recommendation letter to President Harrison and Dean Hailu sometime in November 2013. (*Id.*).

---

[1] In adjudicating CSCC's motion to dismiss, the Court accepts as true all of Crawford's well-pleaded factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); (*see* Third Am. Compl., Doc. 21).

Following receipt of the petition and letter, President Harrison met with the student-author.  (*Id.* at ¶ 18).  President Harrison then met with Dean Hailu and Lisa Schneider, the Interim Dean of the College of Arts and Sciences (parent-college to Crawford's department).  (*Id.* at ¶¶ 3, 19).  Together, the three administrators concluded that Crawford "orchestrated" the letter seeking his promotion to a fulltime position.  (*Id.* at ¶ 19).  After the administrators received the petition and letter, Dean Hailu told Crawford, "Do you think this is a positive for you?  This is not a positive; this is a negative.  This is not how we hire people."  (*Id.* at ¶ 24).

Some of Dean Hailu's frustration may have stemmed from Crawford's outspoken anti-abortion views.  (*Id.* at ¶¶ 20-24, 26-28).  Over the years, Crawford had posted literature on public bulletin boards around CSCC's campus, "most [of which] dealt with religious statements in opposition to abortion."  (*Id.* at ¶ 20).  At one point, CSCC administrators began monitoring Crawford's postings, and in the spring of 2012, Dean Hailu "confronted" Crawford about his activities "and ordered him to stop all postings on campus."  (*Id.* at ¶¶ 21-22).  After that warning, Crawford met with a human resources representative, "who informed him that the bulletin boards where he was placing materials . . . were public and [that] anyone could post on them."  (*Id.* at ¶ 23).  Accordingly, Crawford "continued to post his religiously-oriented materials on those bulletin boards," which "he was informed were for public use."  (*Id.*).

In June 2014, roughly six months after receipt of the student petition and recommendation letter, CSCC posted an opening for a fulltime tenure track position in the Department of Biological and Physical Sciences, with an "Engineering-Physics Emphasis."  (*Id.* at ¶ 29).  The posting sought a successful candidate who possessed "[a]n appropriate combination of education, training, course work[,] and experience," and it included minimum and preferred qualifications which Crawford far surpassed.  (*Id.* at ¶ 30).

Crawford, who holds advanced degrees in Nuclear and Mechanical Engineering, applied for the position. (*Id.* at ¶¶ 10, 31). Crawford's application included a seventeen-page letter and resume. (*Id.* at ¶ 31). In his application letter, Crawford mentioned the student petition and recommendation letter from the previous December. (*Id.*). When he applied for the fulltime position, Crawford was seventy-one years old. (*Id.*).

Dean Hailu then convened a hiring committee to consider the applications that CSCC received. (*Id.* at ¶ 33). Under the hiring process, committee members independently were to score the objective qualifications of each applicant and then choose the five highest-ranking applicants, based on the committee's combined scores, for interviews. (*Id.*).

According to Crawford, Dean Hailu manipulated the hiring process with the agreement of President Harrison and Dean Schneider. (*Id.* at ¶¶ 32, 35). Together, the three administrators "concluded that [Crawford] would be denied the opportunity to be considered for the position" due, in part, to the fact that he orchestrated the student petition and "place[d] anti-abortion literature and objects around campus." (*Id.* at ¶¶ 24, 27, 32). Crawford maintains that his objective qualifications "placed him at the top of the applicant group," but that "his application was dropped" before CSCC officials conducted any interviews. (*Id.* at ¶ 33). Crawford alleges that "[t]he scoring was manipulated to deny [him] an interview." (*Id.*).

On August 20, 2014, the hiring committee interviewed a different applicant, Jeevan Baretto, for the position. (*Id.* at ¶ 34). Professor Baretto, who was forty years younger than Crawford, and who allegedly "possessed dramatically inferior qualifications," was hired two days later. (*Id.*). During the Winter Semester of 2015, Professor Baretto was out of the country and unable to teach the courses he was assigned. (*Id.* at ¶ 36). Dean Hailu assigned a different adjunct lecturer to teach Professor Baretto's fulltime schedule until his return. (*Id.*).

## B. Procedural Background

Crawford—who sought both the fulltime position and a temporary assignment to teach those fulltime courses in Professor Baretto's absence—felt slighted for being passed over in favor of other candidates.  According to Crawford, CSCC officials refused to promote him in retaliation for the exercise of his First-Amendment right to free speech.  (*Id.* at ¶¶ 37-47).  That speech allegedly consisted of the following: (1) orchestrating the student petition and letter of recommendation, which referenced concerns over cheating and poor teaching practices within the Biological and Physical Sciences Department, and referring back to those students' concerns in his own application letter; and (2) "[o]ver the years . . . post[ing] literature on public bulletin boards around CSCC campus . . . . most[ly] deal[ing] with religious statements in opposition to abortion."  (*Id.* at ¶¶ 20, 37-51).  Crawford also contends that CSCC officials refused to promote him due to his age.  (*Id.* at ¶¶ 48-51).

Crawford filed suit under 42 U.S.C. § 1983 against CSCC, as well as Dean Hailu, Dean Schneider, and President Harrison, each in their individual capacity.  He subsequently amended his complaint on several occasions—leaving the operative complaint as the Third Amended Complaint from November 20, 2015, which raised the following three claims:

Count 1:  a First-Amendment retaliation claim based on the student petition and letter of recommendation (*id.* at ¶¶ 37-41);

Count 2:  a First-Amendment retaliation claim based on Crawford's "religiously-based postings in public areas of CSCC campus" (*id.* at ¶¶ 42-47); and

Count 3:  a Fourteenth Amendment age-discrimination claim based on CSCC's decisions to: (a) hire a younger candidate for the fulltime tenure-track position; and (b) deny Crawford a temporary assignment to that position during the Winter Semester of 2015 (*id.* at ¶¶ 48-51).

CSCC and the individually named defendants (Dean Michael Hailu, Dean Lisa Schneider, and President David Harrison) moved to dismiss all of Crawford's claims under Rule 12(b)(6). (Doc 24). In doing so, CSCC attached several exhibits to its motion, prompting another round of briefing from the parties over whether to strike those exhibits under Rule 12(f) or to convert CSCC's motion to dismiss into a motion for summary judgment under Rule 12(d). (*See* Mot. to Strike, Doc. 25; Mem. in Opp'n, Doc. 28; Reply Br., Doc. 30). Both matters now are ripe for review.

## II. STANDARD OF REVIEW

The defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). Under modern federal pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint will survive a motion to dismiss if the plaintiff alleges facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Iqbal*, 556 U.S. at 678. A complaint must thus "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable theory." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In assessing the sufficiency and plausibility of a claim, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Thus, dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 429 (6th Cir. 2012) (quotation omitted).

### III. ANALYSIS

Crawford's Section 1983 action raises two First-Amendment retaliation claims and a separate age-discrimination claim under the Fourteenth Amendment. The Court will assess the sufficiency of each claim in turn.

#### A. Crawford Fails to State a Claim Upon Which Relief May Be Granted Against CSCC.

At the outset, the Court must grant the defendants' motion to dismiss all claims against CSCC itself. Crawford named CSCC and three school administrators, acting in their individual capacities, as defendants. (Doc. 21, ¶¶ 1-8). But the statute under which he brought this suit, 42 U.S.C. § 1983, does not authorize his claims against CSCC—a state community college. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that § 1983, which authorizes suit against any "person" acting under color of state law, does not apply to states or state agencies); *Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 307, 310 (6th Cir. 1984) (finding that Ohio's "state colleges and universities" form "an arm of the state entitled to immunity in federal court" under § 1983 as opposed to "political subdivision[s] of the state"); *Stevenson v. Owens State Cmty. Coll.*, 562 F. Supp. 2d 965, 968-70 (N.D. Ohio. 2008) (extending *Hall* to Ohio's community colleges and agreeing that those community colleges are "entit[ies] of the state" that cannot be sued under § 1983).

#### B. Crawford Fails to State a Claim as to Count 1 Because the Relevant "Speech" Was Not Constitutionally Protected.

Crawford may proceed under § 1983 with his claims against the remaining three defendants in their individual capacities. Nevertheless, Count 1—which alleges First-Amendment retaliation based on the student petition and recommendation letter (and Crawford's later reference to them)—fails to state a claim upon which relief can be granted. Crawford's speech was not constitutionally protected.

7

Public employees, by virtue and necessity of their employment, "must accept certain limitations on [their] freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  Government employers, like their private-sector counterparts, "need a significant degree of control over their employees' words and actions," for without it, "there would be little chance for the efficient provision of public services." *Id.*  That said, public employees do not forfeit their constitutional right to freedom of speech simply by entering government service. *Id.* at 417.  Rather, public employees retain the right, "in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.*  So long as public employees speak as citizens regarding matters of public concern, "they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419-20 ("[W]hile the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983))).

To balance these interests properly, as well as the *public's* interest in receiving the well-informed views of government employees, the Supreme Court has established a three-part test for determining whether a public employee's speech receives constitutional protection.  Thus, a public employee alleging First-Amendment retaliation must show the following: (1) that his speech was made as a private citizen, rather than pursuant to his official duties; (2) that his speech involved matters of public concern; and (3) that his interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in promoting the efficiency of the public services it performs through its employees. *Id.* at 417-18; *see also, e.g.*, *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012); *Westmoreland v. Sutherland*, 662 F.3d 714, 718-19 (6th Cir. 2011).  Dismissal under Rule 12(b)(6) is appropriate when a plaintiff fails to state facts sufficient to make this required showing. *Handy-Clay*, 695 F.3d at 540-41.

8

Even accepting Crawford's allegations as true, he failed to allege facts justifying an inference that he spoke as a private citizen on matters of public concern when he tacitly endorsed the student petition and recommendation letter and later referenced them in his own application.

### 1.  Standing/Claims-Processing Rules

It is not clear that Crawford can rest his retaliation claim on the speech of another person—namely, the student who drafted, circulated, and presented the petition and recommendation letter to school administrators.  As a general rule, a plaintiff may only assert his own injury in fact and "cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975); *Key v. Finks*, No. 4:09-CV-00658 JLH, 2010 WL 3515720, at *6 (E.D. Ark. Sept. 1, 2010) (declining First-Amendment protection where retaliation was alleged to be as a result of someone else's speech).  Nevertheless, assuming Crawford *can* rest his claim based on the student's petition and recommendation—through some form of association with the student and *his* protected speech, *see Benison v. Ross*, 765 F.3d 649, 658-59 (6th Cir. 2014), or by referencing/adopting the student's speech in Crawford's *own* application—Crawford still failed to state a claim, as explained below.

### 2.  Sufficiency of the First-Amendment Retaliation Claim

Crawford was not speaking as a "private citizen" on matters of "public concern" in either the initial student petition and recommendation letter or in his later reference to those documents within his own application.  Drawing all reasonable inferences in Crawford's favor, the petition and recommendation formed a hybrid product—aimed squarely at two distinct purposes: (1) securing a fulltime position for Crawford within the department; and (2) notifying school administrators about allegations of cheating, poor teaching, and other concerns within the department, including bad lab experiences.  (Doc. 21, ¶¶ 15-16).

9

To the extent the "speech" at issue "recommend[ed] that [Crawford] be promoted to a full-time position because of [his] superior teaching and tutoring," (*id.* at ¶ 15)—it falls outside the ambit of addressing matters of public concern. *See Connick v. Myers*, 461 U.S. 138, 147-49 (1983) (holding that "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency" and that "one employee's dissatisfaction" with hiring or transfer decisions ordinarily does not give rise to a retaliation claim). Put simply, "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs," including hiring and promotion decisions. *Id.* at 149; *see also, e.g.*, *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) (holding that doctor's "prolific writings"—whose "primary aim was to protect her own reputation and individual development as a doctor"—were not protected speech because they did not touch on matters of public concern); *Avgerinos v. Palmyra-Macedon Cent. Sch. Dist.*, 690 F. Supp. 2d 115, 134 (W.D.N.Y. 2010) ("[T]he Court finds that plaintiff's concerns related to an internal District matter as opposed to a matter of public concern . . . . [P]laintiff's alleged complaints focused on his own personal employment application rather than general complaints of the District's employment practices."); *Blizer v. Potter*, No. 03 CIV. 6124 (DLC), 2005 WL 1107064, at *15 (S.D.N.Y. May 6, 2005) (concluding that plaintiff was not speaking "'as a citizen upon matters of public concern,' but only as an applicant on matters of personal interest" when he included certain materials in his job application packet (quotation omitted)). At bottom, where, as here, nothing about the "content, form, [or] context of a given statement" suggests that it touches on "any matter of political, social, or other concern to the community," the statement cannot form the basis of a First-Amendment retaliation claim. *See Connick*, 461 U.S. at 146-47; *Westmoreland*, 662 F.3d at 719.

And, to the extent the "speech" at issue "address[ed] student concerns about indifference to cheating in some physics classes, poor teaching, and other [departmental] concerns," (Doc. 21, ¶ 15)—which, if viewed in a light most favorable to Crawford, could involve matters of public concern—it falls outside the ambit of coming from a "private citizen." *See Garcetti*, 547 U.S. at 421. As the Supreme Court has explained, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Id.* Courts look to the "content and context" of the speech to determine whether it was made in connection with an employee's official duties, including "the impetus for [the] speech, the speech's audience, and its general subject matter." *Handy-Clay*, 695 F.3d at 540 (quotation omitted). Other considerations include "whether the statements were made to individuals 'up the chain of command,' and whether the content of the speech is 'nothing more than the quintessential employee beef: [that] management has acted incompetently.'" *Id.* (citations omitted).

Here, the speech involved allegations of cheating and poor teaching within the Department of Biological and Physical Sciences. These allegations, which *could* involve matters of public concern, nevertheless were "directly related to [Crawford's] job responsibilities and thus, [his] speech was made in [his] capacity as an employee and not as a private citizen." *See Handy-Clay*, 695 F.3d at 541-42. To be sure, the Court does not have a written job description outlining Crawford's duties as an adjunct lecturer; but "[s]peech by a public employee made pursuant to *ad hoc* or *de facto* duties not appearing in any written job description is nevertheless not protected if it owes its existence to [the speaker's] professional responsibilities." *Fox v. Traverse City Area Public Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (quotation omitted).

Surely statements made (or adopted) by an educator—directly to his superiors—regarding potential cheating or the quality of teaching fall within the "ad hoc" or "de facto" responsibilities of that educator. *See id.* at 349 (determining that teacher's complaints about class size, made directly to school administrators, owed their existence to her professional responsibilities). The Sixth Circuit routinely finds that similar speech does not receive constitutional protection because the speaker acted as an employee in voicing those concerns and not as a "private citizen." *See, e.g., Handy-Clay*, 695 F.3d at 541-42 (affirming dismissal of First-Amendment retaliation claim from public records coordinator regarding "complaints about obstacles interfering with her ability to produce records"); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 543-44 (6th Cir. 2007) (concluding that park ranger's statements about morale and performance issues were made pursuant to official duties, even though making such statements was an *ad hoc* duty not described in the ranger's official job description); *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007) (concluding that police officer's memo to his superior officer expressing discontent about financial cutbacks and changes to canine-training program he directed was not protected speech); *see also Davis v. McKinney*, 518 F.3d 303, 313 (5th Cir. 2008) (collecting out-of-circuit cases).

Things might look differently if, for example, Crawford alleged that he raised his concerns as stand-alone speech in "[s]worn testimony in judicial proceedings," *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014); in a "letter to the editor," *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty, Ill.*, 391 U.S. 563, 566 (1968); to "a number of individuals both inside and outside [his] department," *Handy-Clay*, 695 F.3d at 542; or to an "outside law enforcement agency," *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007). But Crawford made no such allegations.

12

Instead, looking to the overall "content and context" of Crawford's speech—the Third Amended Complaint shows that he raised his concerns over alleged student cheating and poor teacher quality in communications regarding his desire and qualifications for a promotion, sent directly to those in his chain of command.  Thus, the content of his speech "reflects nothing more than 'the quintessential employee beef: management has acted incompetently.'"  *See Haynes*, 474 F.3d at 365 (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988)).  The First Amendment does not protect this sort of everyday employee grievance, made pursuant to a public employee's duties—official, ad hoc, or otherwise.  *Id.*

Because Crawford's complaint, even liberally construed, does not allege sufficient facts to infer that he spoke as a "private citizen" on "matters of public concern" in the student petition and letter of recommendation, the Court need not reach the balancing test first outlined in *Pickering*.  *Garcetti*, 547 U.S. at 418 ("The first [test] requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." (citation omitted)).

## C.  Qualified Immunity

Moreover, even if Crawford *had* stated a First-Amendment retaliation claim in Count 1 that was plausible on its face, that claim still fails because Dean Hailu, Dean Schneider, and President Harrison remain cloaked in qualified immunity.  Government officials performing discretionary functions "are generally shielded from civil liability as long as their conduct 'does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known.'"  *Haynes*, 474 F.3d at 362 (emphasis added) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Crawford points to *no* case, from this Circuit or any other, in which a court found a First-Amendment violation based on a public employer's refusal to promote an employee who referenced departmental performance issues, directly connected to that employee's job duties, in connection with the employee's desire (and application) for a promotion. Crawford thus "is *a fortiori* unable to satisfy the second prong of the qualified-immunity analysis—that the constitutional right was clearly established." *See id.* at 365.

### C. Crawford *Has* Stated a Claim on Which Relief Can Be Granted as to Count 2.

In contrast, Crawford *has* stated a claim upon which relief can be granted with respect to Count 2, which is based on the public expression of his anti-abortion views.

#### 1. Sufficiency of the First-Amendment Retaliation Claim

Crawford's religiously based speech regarding abortion occurred through his role as a private citizen—not as an employee. Indeed, the content and context of that speech has nothing to do with his duties as an adjunct lecturer. The "impetus for [his] speech" (expressing his religious/political views), "the setting of [his] speech" (public message boards), "the speech's audience" (the general public), and "its general subject matter" (abortion) all demonstrate that Crawford acted while "speaking as a 'citizen.'" *See Handy-Clay*, 695 F.3d at 540.

Crawford's abortion-related speech likewise "touched on matters of public concern." *Id.* at 543. Anti-abortion views (or any views on abortion, for that matter) form quintessential speech regarding "any matter of political, social, or other concern to the community." *See id.* (quotation omitted); *see also Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 256 (6th Cir. 2006) ("Speech made to a public audience, outside the workplace, and involving content largely unrelated to government employment indicates that the employee speaks as a citizen, not as an employee, and speaks on a matter of public concern.").

Finally, although in many cases "the [*Pickering*] balancing test cannot be performed on a 12(b)(6) motion" due to inadequate factual development, *Perry v. McGinnis*, 209 F.3d 597, 607 (6th Cir. 2000) (quotation omitted), this is not such a case. The Court "cannot say that [Crawford] will be unable to show that his interest in First Amendment expression outweighed [CSCC's] interest in the efficient operation of his workplace." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir. 2006) (denying university's motion to dismiss). Indeed, at this stage of the case, the *Pickering* balancing test heavily favors Crawford. *Id.*[2]

In addition to pleading factual allegations sufficient to establish that he engaged in constitutionally protected speech (which he has), Crawford must allege facts sufficient to show that "an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that [speech]" and that "the adverse action was motivated at least in part by [his] protected conduct." *Handy-Clay*, 695 F.3d at 539 (describing other elements of a § 1983 claim for First-Amendment retaliation). Crawford has alleged such facts.

---

[2] Defendants attached several exhibits related to Crawford's history of referencing other political matters, including abortion and "Obamacare," in videos and emails he sent to his students. (Mot. to Dismiss, Doc. 24, Ex. 1). Defendants argue that these exhibits swing the "balancing" test from *Pickering* in their favor. (*Id.* at PageID 264-66). Crawford opposed CSCC's attempt to introduce factual material extraneous to his complaint. (Mot. to Strike, Doc. 25).

Ordinarily, "when a party moves to dismiss an action under Fed. R. Civ. P. 12(b)(6), the court may only consider the pleadings." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997). One exception to this rule allows defendants to attach documents to a motion to dismiss when "they are referred to in the plaintiff's complaint and are central to [his] claim." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (quotation omitted). This exception exists because "[o]therwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Id.*

Here, the relevant exhibits (Exhibits A and B) were not "referred to" in Crawford's complaint, nor are they "central" to his claim in Count 2. Accordingly, the Court will not invoke the permissive exception described in *Weiner* but instead will **GRANT** Crawford's motion to strike those exhibits (Doc. 25). Moreover, while Exhibits C, D, and E—which relate to the student petition and recommendation letter discussed above—were "referred to" in Crawford's complaint and "central" to Count 1, the Court did not consider or rely on those exhibits in granting Defendants' motion to dismiss that count. Accordingly, the Court likewise **GRANTS** Crawford's motion to strike those exhibits.

As the en banc Sixth Circuit noted, examples of "adverse action" that would chill a person of ordinary firmness from engaging in protected conduct "include discharge, demotions, *refusal to hire*, nonrenewal of contracts, *and failure to promote*."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc) (emphasis added); *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990) ("[P]romotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees."); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (holding that "denying an employee a promotion is an adverse employment action" for First-Amendment purposes); *Suppan v. Dadonna*, 203 F.3d 228, 234-35 (3d Cir. 2000) (holding that failure to promote constitutes an adverse action that would chill a person of ordinary firmness).  Whether CSCC's decision to hire Professor Baretto instead of Crawford is viewed as a refusal to hire or a failure to promote—it marks a classic example of an adverse employment action that would chill a person of ordinary firmness from exercising his or her constitutional right to free speech.

And, as Crawford's complaint adequately alleges, the adverse action was motivated at least in part by his protected speech.  According to the complaint, which the Court must accept as true, Dean Schneider wrote to Jack Cooley, Senior Vice-President for Academic Affairs, on December 20, 2013, and informed him that "if a full-time position were 'ever to materialize, Thomas Crawford may not be suitable for the position' because he "places anti-abortion literature and objects around campus."  (Doc. 21, ¶ 27).  Dean Schneider followed up by noting that the administration would "continue to monitor Dr. Crawford's extra-curricular activities," and the complaint alleges that "Defendants Schneider and Hailu did monitor [Crawford's] activities of posting materials in public spaces on campus."  (*Id.* at ¶ 28).  Just six months later, that full-time position *did* "materialize," but Crawford was passed over for it.

16

In most cases, "[a] defendant's motivation for taking action against the plaintiff is . . . a matter best suited for the jury." *Handy-Clay*, 695 F.3d at 545 (quotation omitted).  As such, a plaintiff pleads sufficient factual allegations to withstand a motion to dismiss under Rule 12(b)(6) where "there is enough evidence . . . to support the proposition that the defendants knew of [the plaintiff's] protected speech" and "the chronology of events supports an inference of causation." *Id.* at 545-46.  Here, Crawford's complaint satisfies both factors.  The complaint alleges that Dean Schneider and Dean Hailu knew of Crawford's anti-abortion postings, and the chronology of events (warning, then monitoring, followed by a refusal to hire/failure to promote) supports an inference of causation.

The defendants do not seriously contest any of these points; instead, they simply contend that Crawford's allegations regarding his public postings on campus were too vague and conclusory to satisfy the "heightened" pleading standards announced in *Twombly* and *Iqbal*. (Doc. 24, PageID 264-66).  The Court disagrees.  Even after *Twobly* and *Iqbal*, plaintiffs need only allege facts that "'state a claim to relief that is plausible on its face' and that, if accepted as true, are sufficient to 'raise a right to relief above the speculative level.'"  *See Handy-Clay*, 695 F.3d at 538 (quoting *Twombly*, 550 U.S. at 555, 570).  Crawford has satisfied this burden. *See Sensations Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) ("Federal Rule of Civil Procedure 8(a)(2) requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" (quoting *Erickson v. Pardus*, 500 U.S. 89, 93 (2007))).  Crawford was required to allege that he placed anti-abortion postings around campus; he was not required to describe, in precise detail, *what* each of those postings said or on *which* precise bulletin boards he posted them.

### 2.  Qualified Immunity

As the discussion above demonstrates, the individual defendants are not entitled to qualified immunity on Count 2 at this stage of the case.  By August 2014, clearly established federal law held that public employers could not take adverse actions against their employees for exercising their right to speak on issues of public importance in circumstances closely analogous to those alleged here.  *Pickering*, 391 U.S. at 574 ("[I]n a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be."); *Scarbrough*, 470 F.3d at 253, 263 (denying qualified immunity to school administrators who refused to reappoint county school superintendent after he agreed to be "the featured speaker at a convention sponsored by a church with a predominantly homosexual congregation").

Make no mistake: "because *Pickering* and *Connick* require courts to balance competing interests to determine if an employee's speech is protected," it might seem "unclear to a reasonable official what the outcome of the balancing inquiry should be" in many cases. *Scarbrough*, 470 F.3d at 263 (quotation omitted).  This counsels in favor of affording officials qualified immunity.  *Id.*  Nevertheless, "the greater the speech's relationship to a matter of public concern and the more minimal the effect on office efficiency the more likely a reasonable person would be to understand that the employer's actions violated the Constitution."  *Id.*  And where, as here, "the scene painted by the [operative] Complaint is crystal clear"—in that "the Administrators retaliated against [an adjunct lecturer] for making protected statements that they did not like"—it "would be difficult to fathom" a clearer constitutional violation.  *Ridpath*, 447 F.3d at 321 (denying qualified immunity at motion-to-dismiss stage).

18

Crawford's right to express himself was clearly established by August 2014, and thus, the individual college administrators are not entitled to qualified immunity on Count 2 of the Third Amended Complaint.

### D.  Crawford *Has* Stated a Claim on Which Relief Can Be Granted as to Count 3 Because the Age Discrimination in Employment Act ("ADEA") Does *Not* Provide the Exclusive Federal Remedy for Age Discrimination in Employment.

Crawford also stated a claim upon which relief can be granted with respect to Count 3, which alleged age discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

### 1.  Sufficiency of the Age-Discrimination Claim Under the Fourteenth Amendment

The Equal Protection Clause provides that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  To state an equal-protection claim, a plaintiff need only plead "that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, *or has no rational basis*.'"  *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (emphasis added) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)).  Although "age is not a suspect classification under the Equal Protection Clause," States may discriminate on the basis of age without violating the Fourteenth Amendment only "if the age classification in question is rationally related to a legitimate state interest."  *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000).  Here, Crawford has alleged sufficient facts to state an equal-protection claim based on age-discrimination—*i.e.*, he adequately pleaded that CSCC denied him the fulltime tenure track position in favor of a less-qualified (albeit younger) applicant for no rational basis.  (Doc. 21, ¶¶ 29-36, 48-51).

19

2.  Potential Preclusion Under the ADEA

The defendants do not contest the sufficiency of the allegations contained in Crawford's constitutional claim.  Instead, they argue that the ADEA precludes his § 1983 equal-protection claim altogether.  (Doc. 24, PageID 267-68).  Although Defendants find support in a number of appellate decisions which hold that the ADEA *does* preclude age-discrimination claims under the Fourteenth Amendment, the Sixth Circuit has never addressed this issue, and a recent opinion from the Seventh Circuit persuasively held that the ADEA does *not* preclude such claims.  In the absence of binding authority from the Supreme Court or the Sixth Circuit, this Court will follow the well-reasoned opinion in *Levin v. Madigan*, 692 F.3d 607 (7th Cir. 2012), in holding that the ADEA does not foreclose Crawford's constitutional age-discrimination claim.

The Supreme Court has held, on several occasions, that a detailed statutory scheme *can* preclude claims brought under § 1983 that assert other statutory or constitutional violations. *See, e.g.*, *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981) (precluding plaintiffs from bringing § 1983 actions based on violations of two federal maritime statutes because both Acts "provide quite comprehensive enforcement mechanisms"); *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 119 (2005) (precluding plaintiffs from bringing § 1983 actions under the Telecommunications Act of 1996 because the statute provided its own, more restrictive judicial remedy); *Smith v. Robinson*, 468 U.S. 992, 1009 (1984) (holding that Congress intended the Education of the Handicapped Act "to be the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education"); *Preiser v. Rodriquez*, 411 U.S. 475, 477 (1973) (finding § 1983 constitutional claims for good-time prison credits foreclosed by federal habeas corpus statutes).

Despite these cases, the Supreme Court "does not 'lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federal right." *Levin*, 692 F.3d at 613 (quoting *Smith*, 468 U.S. at 1012). Indeed, the Court has rejected similar § 1983 preclusion arguments in several other cases, including those involving Title IV-D of the Social Security Act, the Medicaid Act, the Department of Housing and Urban Development's generalized powers under its regulations and an amendment to the Fair Housing Act, and Title IX of the Education Amendments of 1972. *Id.* (collecting cases).

Congressional intent forms the crux of any § 1983 preclusion analysis, and that intent can be gleaned "from the language of the statute and legislative history, the statute's context, the nature and extent of the remedial scheme, and a comparison of the rights and protections afforded by the statutory scheme versus a § 1983 claim." *Id.* at 615 (citations omitted). Based on these factors, and in the absence of a controlling decision from the Supreme Court, the circuit courts have split over whether the ADEA precludes § 1983 actions that raise age-discrimination claims under the Equal Protection Clause. *Compare, e.g.*, *Zombro v. Baltimore City Police Dep't*, 868 F.3d 1364 (4th Cir. 1989) (finding that the ADEA precludes a § 1983 equal-protection claim), *and Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051 (9th Cir. 1999) (same), *with Levin*, 692 F.3d at 621-22 ("In light of our analysis of the ADEA and the relevant case law, and given these divergent rights and protections, we conclude that the ADEA is not the exclusive remedy for age discrimination in employment claims."). District courts in circuits that have not weighed in on this issue remain split as well. *Compare, e.g.*, *Shapiro v. N.Y. City Dep't of Educ.*, 561 F. Supp. 2d 413 (S.D.N.Y. 2008) (finding no preclusion), *and Mustafa v. Neb. Dep't of Corr. Servs.*, 196 F. Supp. 2d 945 (D. Neb. 2002) (same), *with Kelley v. White*, No. 5:10-cv-288, 2011 WL 4344180 (E.D. Ark. Sept. 15, 2011) (finding preclusion).

The Sixth Circuit has never determined whether the ADEA precludes § 1983 actions alleging age discrimination under the Equal Protection Clause.  The court has, however, held that the ADEA precludes § 1983 actions alleging *statutory* violations of the ADEA itself, albeit in an unpublished, and thus non-binding, decision from 1996.  *Janes v. Bardstown City Schs. Bd. of Educ.*, 97 F.3d 1452, 1996 WL 536794, at *4 (6th Cir. 1996) (unpublished table decision) ("Mrs. Janes may not bring her ADEA claim under § 1983.  The detailed statutory remedy created by the ADEA constitutes the exclusive means for enforcement of the Act.").  The *Janes* decision, short as it was, makes sense because "the ADEA enacts a comprehensive statutory scheme for enforcement of *its own statutory rights*, akin to *Sea Clammers* and *Rancho Palos Verdes*."  *Levin*, 692 F.3d at 617 (emphasis added) (agreeing that the ADEA precludes § 1983 actions that allege violations of the ADEA itself).  Thus, in *Janes*, the court found the plaintiff's § 1983 claim (predicated on the ADEA itself) precluded by the ADEA because she failed to avail herself of the administrative remedies provided by the statute.  *Janes*, 1996 WL 536794, at *4.  Nevertheless, whether the ADEA precludes § 1983 actions alleging *constitutional* claims, like Crawford's, remains an open issue in this Circuit.

Given this lack of binding authority, coupled with a split of opinion between both the other circuit courts and district courts that lack guidance from on-high, *this* Court opts to follow the Seventh Circuit in *Levin* in holding that the ADEA does not preclude § 1983 actions alleging *constitutional* violations.  The Court agrees that a fair reading of the statutory text and legislative history, coupled with a comparison of the rights and protections afforded under the ADEA and the Constitution, all demonstrate that Congress did not intend for the ADEA to preclude § 1983 actions that seek to vindicate constitutional rights.  *Levin*, 692 F.3d at 617-22.

Take, for example, the statutory text and legislative history of the ADEA as analyzed in *Levin*.  As the Seventh Circuit there concluded, "[n]othing in the text of the ADEA expressly precludes a § 1983 claim or addresses constitutional rights.  Nor does the legislative history provide clear guidance on this issue."  *Id.* at 617-18 & n.3. (citations omitted).  Rather than foreclosing constitutional grievances altogether, "Congress's silence on the issue tells [courts] nothing about preclusion."  *Id.* at 618.  And while the ADEA does "set[] forth a rather comprehensive remedial scheme," by "provid[ing] a private right of action, requir[ing] notice and exhaustion of remedies, and limit[ing] the damages available under the Act," this scheme speaks solely "as to how Congress intended allegations of *statutory* age discrimination to proceed."  *Id.*  The ADEA does not, however, "purport to provide a remedy for violation of federal constitutional rights," and "no express language indicates that Congress intended to foreclose relief under § 1983 for constitutional violations."  *Id.* (quotation omitted).  Under these circumstances, the Court cannot presume that Congress repealed by implication rights enshrined in the Federal Constitution.  *Id.* ("[T]he Supreme Court has emphasized on several occasions that 'repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest.'" (quoting *Hui v. Castaneda*, 559 U.S. 163, 175 (2009))).

Take also, for example, a comparison of the rights and protections afforded under the ADEA and the Constitution.  As set forth in the *Levin* rationale, "the rights and protections afforded by the ADEA and § 1983 equal protection claims diverge in a few significant ways," thus undercutting any argument in favor of preclusion.  *Id.* at 621.  First, an ADEA plaintiff may sue only his employer, an employment agency, or a labor organization, *see* 29 U.S.C. § 623, whereas a § 1983 plaintiff may sue any individual, "so long as that individual caused or

23

participated in the alleged deprivation of the plaintiff's constitutional rights," *Levin*, 692 F.3d at 621. Section 1983 plaintiffs may also sue municipal governments under limited circumstances. *Id.* These "divergent rights" as to whom a plaintiff may sue "seriously affect a plaintiff's choice of defendants and his strategy for presenting a prima facie case." *Id.* Second, the ADEA limits or exempts claims by certain individuals, including elected officials and certain members of their staff, appointees, law enforcement officers, and firefighters. *See* 29 U.S.C. §§ 623(j), 639(f). And the ADEA prohibits claims by employees under the age of forty or those bringing reverse age discrimination claims. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 593 (2004). Section 1983 Equal-Protection claims, in contrast, carry "no such limitations." *Levin*, 692 F.3d at 621. Finally, and most relevant here, "state employees suing under the ADEA are left without a damages remedy, as such claims are barred by Eleventh Amendment sovereign immunity." *Id.* (citing *Kimel*, 528 U.S. at 91-92). Thus, "[w]ithout the availability of a § 1983 claim, a state employee [like Crawford] who suffers age discrimination in the course of his employment is left without a federal damages remedy," while a similarly-situated municipal employee would suffer no similar deprivation of his or her constitutional rights and remedies. *Id.*; *see also Mustafa*, 196 F. Supp. 2d at 955 ("[T]he practical effect [of ADEA preclusion] is elimination of all age discrimination claims made against state actors in federal court."). In the absence of congressional intent to that effect, this result seems particularly strange.

All told, in light of the statutory text and legislative history of the ADEA, as well as a close comparison of the rights and protections afforded under the ADEA and the Fourteenth Amendment, the Court agrees that "the ADEA is not the exclusive remedy for age discrimination in employment claims." *Levin*, 692 F.3d at 621. To the contrary, plaintiffs may continue to bring § 1983 actions that allege unconstitutional age discrimination.

### 3.  Qualified Immunity

The defendants' qualified-immunity argument similarly lacks merit.[3]  Defendants argue that because there was no "clearly established law supporting Crawford's attempt to assert an age discrimination claim . . . *under 42 U.S.C. § 1983*, the individual defendants are also entitled to qualified immunity."  (Doc. 24, PageID 268 (emphasis added)).  This argument unnecessarily conflates matters.  Qualified immunity depends on whether a particular *right* is clearly established, not whether "a particular procedural vehicle (*i.e.*, cause of action) is available."  *Levin*, 692 F.3d at 622 (quotation omitted).  The Supreme Court had clearly established the right to be free from irrational age discrimination by the time of the officials' alleged conduct.  *Id.* (citing *Kimel*, 528 U.S. at 83).  Thus, "[w]hether or not the ADEA is the exclusive remedy for plaintiffs suffering age discrimination in employment is irrelevant."  *Id.*  Indeed, it would seem "odd" to afford the officials qualified immunity in this case, where any legal uncertainty "arises from the fact that Congress created a statutory remedy for age discrimination that is substantively *broader* than the equal protection clause."  *Id.* (quotation omitted).  Because Crawford's constitutional right to be free from irrational age discrimination was clearly established at the time of the alleged injury, the individual defendants are not entitled to qualified immunity.

## IV. CONCLUSION

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** CSCC's motion to dismiss (Doc. 24).  The Court likewise **GRANTS** Crawford's motion to strike CSCC's appended exhibits (Doc. 25).  Crawford's suit may proceed against the individual defendants (but not CSCC) as to Counts 2 and 3 from the Third Amended Complaint.

---

[3] Beyond asserting that the ADEA precludes a § 1983 claim, the individual defendants do not challenge the first prong of the qualified immunity analysis—*i.e.*, whether the facts (as alleged) show that the defendants violated Crawford's constitutional right.  Accordingly, the Court will only address the second prong of the qualified immunity analysis—whether that right was "clearly established."

**IT IS SO ORDERED.**

                                       **/s/ Algenon L. Marbley**
                                    **ALGENON L. MARBLEY**
                                    **UNITED STATES DISTRICT JUDGE**

**DATED:  July 11, 2016**