# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

THOMAS CRAWFORD         :
                  :    Case No. 2:15-CV-2438
        Plaintiff,       :
                  :    JUDGE ALGENON L. MARBLEY
    v.               :
                  :    Magistrate Judge Terrence Kemp
COLUMBUS STATE COMMUNITY   :
COLLEGE, et al.,           :
        Defendants.     :

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment (ECF No. 71) of Defendants Columbus State Community College, et al. ("CSCC"). For the reasons set forth below, the Court **DENIES** CSCC's Motion for Summary Judgment as to Plaintiff Thomas Crawford's First Amendment Retaliation claim, **GRANTS** CSCC's Motion for Summary Judgment as to Crawford's Age Discrimination claim, and **GRANTS** CSCC's Motion for Summary Judgment as to Crawford's claims against CSCC President David Harrison.

## I.     BACKGROUND

### A.     Factual Background

Thomas Crawford, born September 25, 1943, has served as an adjunct lecturer in the Department of Biological and Physical Sciences at CSCC since 2002. (Am. Compl., ECF No. 21 at ¶¶ 1, 10). Crawford has a Ph.D. in mechanical engineering and an M.S. in nuclear engineering. For a few years, in addition to his position at CSCC, Crawford lectured at The Ohio State University (OSU). (Crawford Dep. I, ECF No. 64 at 12). Crawford has attested that student evaluations of his teaching have been "almost unanimously positive" and that the evaluations of

his work conducted by Ken Fisher, Department Lead Instructor, have been "uniformly positive." (Crawford Decl., ECF No. 72-1 at 2–3).

In addition to his lecturing duties, Crawford has also been active in developing curriculum for CSCC's engineering program. Jack Cooley, Senior Vice President for Academic Affairs at CSCC, testified that one of CSCC's goals is to prepare students to transfer to schools like OSU. To accomplish that goal, CSCC decided to develop engineering courses and find a professor capable of teaching those courses. (Cooley Dep., ECF No. 63 at 99). To that end, roughly a decade into Crawford's employment, Michael Hailu, the Dean of Crawford's department (and a defendant here), asked Crawford to develop a "Fundamentals of Engineering" program. (ECF No. 21 at ¶ 14). Crawford developed the curriculum, which CSCC subsequently offered as two separate introductory engineering courses. (*Id*.). Crawford taught those courses as an adjunct in addition to training other lecturers on how to teach them. (*Id.*).

But Crawford had also been the subject of scrutiny for some of his behavior on campus. From approximately 2003 to 2012, Crawford publicly posted pro-life literature and materials such as rosaries and small rubber replicas of fetuses that had been painted red to represent blood and make them look more "realistic." (ECF No. 64, 36–37 at 72). Hailu also recalled that Crawford had shown a YouTube video about abortion to his students while they were in class. (Hailu Dep., ECF No. 67 at 66–69). Crawford, for his part, denies that allegation. (ECF No. 64 at 138).

Crawford testified that he received significant backlash to his political and religious speech. On April 4, 2012, Crawford was slipped an anonymous note warning him to stop placing things on corkboards in classrooms. (Crawford Dep. II, ECF No. 65 at 13). About one week later, Crawford received another anonymous note that read: "Hey, Crawford, keep your right wing, nonsensical,

religious nuttery out of my secular college or I will make it my personal mission in life that you are fired and never work in education in this state again." (Appx. Crawford Dec., ECF No. 73-9).

At one point, CSCC administrators began monitoring Crawford's public postings, and on April 23, 2012, Hailu spoke to Crawford about his activities "and ordered him to stop all postings on campus." (ECF No. 21, ¶¶ 21–22). Hailu emailed then-Dean Karen Muir about the meeting, stating that he had "discussed the issue of concern from President's office, with Professor Tom Crawford, and he understands the concern and the CSCC policy regarding the posting of religious and political materials." (Hailu Dep. Exh., ECF No. 67-1 at 117). After that warning, Crawford met with the Human Resources Department—one of the employees there told him that it was permissible to post materials on outside bulletin boards and on the employees-only floor of the building, but that he should not post anything in the classrooms without permission. (ECF No. 64 at 61–62). Crawford therefore continued posting materials on the outside bulletin boards but, from April 2012 on, stopped posting things in classrooms. (*Id.* at 65).

In July 2013, Crawford sent an email to his Engineering 1182 students indicating that he was available to do some tutoring, but that his "three classes sum to 10 contact hours and the limit has been reduced to 11 hours, thanks to ObamaCare." (ECF No. 64 at 113–18; Def. Exh. 5). A student forwarded that email to Hailu, writing that the missive was "unprofessional." (Def. Exh. 5). Hailu then told Crawford that, he, too, believed the email was unprofessional and asked Crawford to come to his office to discuss the incident. (*Id.*). Craword does not recall Hailu's exact words, but indicated that he was told not to repeat the incident and that Crawford should "keep politics out of [the] classroom, just do physics." (ECF No. 64 at 122).

Later that year, Crawford and another adjunct instructor asked then-Associate Vice President of Academic Affairs, Karen Muir, about the reduction of hours for adjunct instructors and the new

engineering classes taught in the Biological and Physical Sciences Department. (ECF No. 64 at 129). Hailu apparently got wind of this meeting, and subsequently criticized Crawford and his fellow adjunct instructor for being "insubordinate" in speaking to Muir rather than communicating their concerns to his immediate supervisor or to the Department Chair. (Def. Exh. 7). He also wrote a summary of what constituted, in his view, Crawford's infractions:

> About a year ago, you sent YouTube videos (political in nature) to your students and the students complained to the President's office regarding the content of the YouTube videos. The President's office, through proper channels contacted me and I have warned you so that this would not happen again; you are only to do your job, i.e. teach physics and engineering to your students – not get into or promote your politics to your students in class. Additionally, employees and students brought to my attention that you were placing political posters and signs across the campus. I also spoke with you and about this and advised you to stop.
>
> Moreover, at the end of Summer (on July 31st) for the Autumn semester you sent your students an email with your syllabus in which you included a statement regarding ObamaCare. Again, the email was forwarded to me from several students indicating that your opinion regarding ObamaCare in a class email was "unprofessional." I discussed this matter with you and you apologized to me as well as you asked me to send an apology email to the students affected. I explained to you that this was going to be your last warning for this kind of behavior.

(*Id.*). At that time, Crawford was not formally disciplined.

The next incident occurred in December 2013. One of Crawford's students approached him and mentioned the idea of recommending Crawford for a full-time position due to his "superior teaching and tutoring." (ECF No. 21 at ¶ 15). The student prepared a recommendation letter and petition for David Harrison, the President of CSCC (and also a defendant in this case), which outlined the case for promoting Crawford. (*Id.* at ¶¶ 15–17). The student submitted this petition and recommendation letter to President Harrison and Hailu sometime in November 2013. (*Id.*).

Following receipt of the petition and letter, President Harrison met with the student-author. (*Id.* at ¶ 18). President Harrison then met with Hailu and Lisa Schneider, the Interim Dean of the College of Arts and Sciences (parent-college to Crawford's department). (*Id.* at ¶¶ 3, 19). Together, the three administrators concluded that Crawford "orchestrated" the letter seeking his promotion to a full-time position. (*Id.* at ¶ 19). Hailu later testified that some students had expressed concerns that if they did not sign the petition, their grades may suffer. (ECF No. 67 at 153). And Crawford testified that Hailu told him: "Do you think this is a positive for you? This is negative. This is not how we hire people. I heard about this coming along. I heard that these students were intimidated into signing this." (ECF No. 64, 82–83).

Crawford, for his part, vigorously contests that he had anything to do with orchestrating the letter and that he only became aware of the letter after it was drafted. But Schneider was nevertheless concerned about the unfolding events. She contemporaneously observed that, due to Crawford's pattern of behavior—as well as complaints that Crawford had been biased against international or minority students— "[i]f a full-time position in Engineering were ever to materialize, Thomas Crawford may not be suitable for the position." (ECF No. 63-1 at 70).

In June 2014, roughly six months after receipt of the student petition and recommendation letter, CSCC posted an opening for a full-time tenure track position in the Department of Biological and Physical Sciences, with an "Engineering-Physics Emphasis." (ECF No. 21 at ¶ 29). The posting sought a successful candidate who possessed "[a]n appropriate combination of education, training, course work[,] and experience," and it included minimum and preferred qualifications which Crawford far surpassed. (*Id.* at ¶ 30).

Crawford, who holds advanced degrees in Nuclear and Mechanical Engineering, applied for the position. (*Id.* at ¶¶ 10, 31). Crawford's application included a seventeen-page letter and resume.

(*Id.* at ¶ 31). In his application letter, Crawford mentioned the student petition and recommendation letter from the previous December. (*Id.*). When he applied for the full-time position, Crawford was seventy-one years old. (*Id.*).

CSCC has memorialized its hiring process in two documents: the Columbus State Community College Policy and Procedures Manual and the Columbus State Community College-Columbus State Educators' Association Collective bargain Agreement. (ECF No. 63-1). Pursuant to those procedures, Hailu convened a hiring committee to consider the applications that CSCC received. (ECF No. 21 at ¶ 33). Under the hiring process, committee members independently were to score the objective qualifications of each applicant and then choose the highest-ranking applicants, based on the committee's combined scores, for interviews. (*Id.*).

Crawford alleges that at least four typical hiring procedures were not strictly followed in the filling of the full-time position in the Department of Biological and Physical Sciences. First, it was typical practice that the chair of the hiring process—in this case, Hailu—would not have substantive input on the hiring process. (Muir Dep., ECF No. 66 at 22; ECF No. 63 at 69–70). That practice was not followed in this case. (*See* ECF No. 67 at 250–51). Second, CSCC policy required the hiring manager to "make every attempt" to interview a minimum of six candidates to ensure a diverse pool of potential hires. (ECF No. 66-1 at 2). Here, the search committee agreed to interview no more than five candidates. (ECF No. 67, 272–73). Third, Human Resources typically would have trained the search committee to ask ten specific questions of candidates—questions that avoided discussion of race, religion, national origin, and age. (*Id.* at 229). But because the same search committee had just filled a position for an Instructor in Astronomy, Hailu and a representative from Human Resources agreed that it was not necessary to repeat the training. (*Id.*) Finally, under CSCC policy, the search committee was to provide Human Resources with the names of three candidates, in unranked order, so the Department Chair and Dean could conduct their interviews and independently

reach a conclusion. (ECF No. 66 at 24). That conclusion would be communicated in a consultative meeting with the Department Chair, the Dean, and the Provost—the ultimate hiring decision rests with the Provost with approval from the President of the CSCC. (ECF No. 66-1 at 2). But the committee only elevated one name for the final interviews. (Schneider Dep., ECF No. 69 at 84)

Forty-nine applicants applied for the position. In the initial meeting of the search committee, the committee agreed to interview five finalists—Hassan Borteh, Jeevan Baretto, Christian Feldt, Ahmad Saatchi, and James Toney. (ECF No. 67 at 265). Hailu recalled that someone mentioned the possibility of a "courtesy" interview for Crawford; the idea was ultimately rejected. (*Id.* at 305).

We have little information about how the committee narrowed the applicants to this list of five finalists. The record does contain, however, the rankings of Kent Fisher, Physics Professor and Lead Physics Instructor at CSCC, and part of the search committee. (ECF No. 71-1, at ¶ 4). In an email to Hailu on July 25, 2014, Fisher ranked Crawford second among all forty-nine applicants and Jeevan Baretto ninth among the forty-nine candidates. (ECF No. 73-6). Before the applicant pool was narrowed to the five finalists, Fisher had advocated "weeding out" candidates that did not have a Ph.D. or M.S. in Engineering. (*Id.*) And after the five finalists were selected, Fisher wrote Hailu an email observing that "if Borteh and Tony don't have [engineering] degrees, then we can't hire them for the position and should not offer them interviews." (*Id.*)

The only other evidence related to the individual committee members' ranking of the finalist candidates is Hailu's list of his personal selections—Crawford was not among them. (ECF No. 67 at 254). When asked why Crawford was not on his list of finalists, Hailu replied that it was "[b]ecause of [Crawford's] activity. I was frustrated with him. In my opinion he's not the best candidate." (*Id.* at 255). He continued: "His behavior, his character, his everything is very problematic to me. . . . He argues a lot with me. He doesn't listen to me. It's very difficult to work with him." (*Id.* at 261).

The committee proceeded to interview each of the five finalists. Fisher "recall[ed] being somewhat disappointed by the search process until the search committee interviewed Jeevan Baretto," (ECF No. 71-1 at 3) a younger applicant who had recently obtained a Ph.D. in chemical engineering from OSU. Baretto was, in Fisher's view, "excellent in his interview." (*Id.*) And because CSCC hoped to develop its engineering program in part to develop a conduit for engineering students to transfer to OSU, Baretto's OSU connection was viewed as a positive factor in his candidacy. (ECF No. 66 at 52–54).

Next, Fisher contacted Baretto's references at OSU. (ECF No. 71-1 at ¶ 9). Dr. Tomasko, Associate Dean of Undergraduate Engineering at OSU, told Fisher that although Baretto's degree in chemical engineering Baretto would have involved different training than would a degree in mechanical engineering, Baretto was nevertheless "fully qualified to teach the introductory engineering courses" and that Baretto had an "enthusiasm for helping students" that would suit him well to the position. (*Id.*, Exh. F). But Baretto's other reference at OSU, Dr. Hall, observed that Baretto's degree in chemical engineering and dissertation work on bioengineering was likely not closely relevant to industrial engineering. And while Dr. Hall believed that "any science or engineering Ph.D." should be able to analyze and present data—which constituted a large chunk of the introductory engineering curriculum—she was unsure whether Baretto had any experience with "drafting or solid modeling programs"—another component of the curriculum. (ECF No. 73-6 at 19–20).

Ultimately, the hiring committee unanimously determined that Baretto was the best candidate for the position. (*Id.*, Exh. H).

Next, then-interim Dean of Arts & Sciences Lisa Schneider and incoming Dean of Arts & Sciences Allyson Todd interviewed Baretto. Schneider and Todd reviewed Baretto's resume,

interviewed him, and subsequently recommended Baretto for the position. (ECF No. 69 at 106–07). What happened next is contested. The Provost, Jack Cooley, recalls a meeting with Schneider and Hailu in which they had indicated that the search committee had found that Baretto was the most qualified candidate, and that Cooley "affirmed" their selection. (ECF No. 63 at 83). Schneider does not recall speaking to Cooley about Baretto and had believed that Human Resources was responsible for final approval of the candidate. (ECF No. 69 at 108).

Crawford argues that this was not the first time that CSCC failed to give him fair consideration for a position. In 2008, CSCC cleaved the Department of Physical and Biological Sciences in two, and conducted a competitive search for the newly-created position of Chair of the Department of Physical Science. Hailu decided not to apply for that position at the time because he was "not interested" in the job. (ECF No. 67 at 21). But Crawford had applied, was considered, and ultimately did not receive the job. (ECF No. 74 at 2). A few months later, the inaugural Chair of the Department of Physical Science resigned. (ECF No. 63 at 36–37). The Department unanimously decided to appoint Hailu as interim Chair, and nine months later Hailu was made permanent Chair. (*Id.*). In 2012, CSCC merged the Department of Physical and Biological sciences once again, and Hailu was elevated to Dean of the reconstituted Department. (ECF No. 63-1 at 12–13). Crawford believes that Hailu's initial appointment and subsequent elevation were inappropriate because Hailu does not hold a Ph.D. and because several faculty members later lodged complaints against Hailu. (ECF No. 74 at 2–3).

Plaintiff also argues that it was not the last time CSCC failed to give him fair consideration for a position. After Baretto was hired, the full-time position teaching Fundamentals of Engineering twice re-opened; both times, Crawford was passed over. (ECF No. 74 at 44–45).

## B.        Procedural Background

Crawford sued his employer and several of its high-ranking officials under 42 U.S.C. § 1983. According to Crawford, CSCC officials refused to promote him in retaliation for the exercise of his First-Amendment right to free speech. (ECF No. 21 at ¶¶ 37–47). That speech allegedly consisted of the following: (1) orchestrating a student petition and letter of recommendation, which referenced concerns over cheating and poor teaching practices within the Biological and Physical Sciences Department, and referring back to those students' concerns in his own application letter; and (2) "[o]ver the years . . . post[ing] literature on public bulletin boards around CSCC campus . . . . most[ly] deal[ing] with religious statements in opposition to abortion." (*Id.* at ¶¶ 20, 37–51). Crawford also contends that CSCC officials refused to promote him due to his age. (*Id.* at ¶¶ 48–51)

Crawford filed suit under 42 U.S.C. § 1983 against CSCC, as Hailu, Dean Schneider, and President Harrison. He subsequently amended his complaint on several occasions—leaving the operative complaint as the Third Amended Complaint from November 20, 2015, which raised the following three claims:

Count 1:    a First-Amendment retaliation claim based on the student petition and letter of recommendation (*id.* at ¶¶ 37-41);

Count 2:    a First-Amendment retaliation claim based on Crawford's "religiously-based postings in public areas of CSCC campus" (*id.* at ¶¶ 42-47); and

Count 3:    a Fourteenth Amendment age-discrimination claim based on CSCC's decisions to: (a) hire a younger candidate for the full-time tenure-track position; and (b) deny Crawford a temporary assignment to that position during the Winter Semester of 2015 (*id.* at ¶¶ 48-51).

CSCC and the individually-named defendants moved to dismiss all of Crawford's claims under Rule 12(b)(6). (Mot. to Dismiss, ECF No. 24). In doing so, CSCC attached several exhibits to its motion, prompting another round of briefing from the parties over whether to strike those exhibits

under Rule 12(f) or to convert CSCC's motion to dismiss into a motion for summary judgment under Rule 12(d). (*See* Mot. to Strike, ECF No. 25; Mem. in Opp'n, ECF No. 28; Reply Br., ECF No. 30).

In a July 11, 2016, Order, this Court granted in part and denied in part the defendants' motion to dismiss. (ECF No. 33). It granted the defendants' motion to dismiss all claims against CSCC itself. (*Id.* at 7). And it granted defendants' motion to dismiss Count 1—the First Amendment retaliation claim based on the student petition and the recommendation letter. (*Id.*) But it denied the motion to dismiss Count 2 and Count 3—the First-Amendment retaliation claim based on Crawford's views on abortion and the age discrimination claim. (*Id.*) In the same Order, this Court granted Crawford's motion to strike the exhibits that CSCC appended to its motion to dismiss. (*Id.*).

Only two claims remain: the First Amendment retaliation claim based on Crawford's views on abortion, and the age discrimination claim, both under 42 U.S.C. § 1983. Defendant now moves for summary judgment on those claims. (Mot. for Summ. J., ECF No. 71).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hosp.*, 964 F.2d

577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

## III.    ANALYSIS

### A.    First Amendment Retaliation Claim Based on Abortion-Related Speech

For a public employee to succeed on a First Amendment retaliation claim, he must establish that:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). CSCC concedes that the injury Crawford alleges—not being hired for a full-time tenure track position—is sufficient to demonstrate that an adverse

action occurred. (ECF No. 71). But it contends that Crawford did not engage in protected speech, and that there was no causal connection between the failure to hire and any protected conduct, so Crawford's case fails on the first and third prongs of the test. Both prongs are analyzed in turn below.

### 1. Crawford engaged in Constitutionally-protected speech.

Crawford identifies one category of speech he engaged him that he believes was the basis of CSCC's failure to hire him: the materials he put on public CSCC bulletin boards, including the plastic fetuses. (ECF No. 74 at 8-9). After his 2012 admonishment, he notes, he ceased posting on bulletin boards in classrooms. (*Id.* at 8). CSCC briefly argues that, as a threshold matter, Crawford did not engage in "speech" at all because "the protected conduct he describes is actually the act of photocopying and distributing" the documents he posted on the bulletin boards. (ECF No. 71 at 24) CSCC cites no case law to support this contention. In any case, the argument would be unavailing: it is the anti-abortion communicative content—not the conduct of photocopying—which Crawford seeks to protect. And to the extent Crawford seeks First Amendment protection for the act of distributing materials, such conduct is "'sufficiently imbued with elements of communication,' to implicate the First Amendment." *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (internal citation omitted) (citing *Spence v. Washington,* 418 U.S. 405, 409 (1974)).

Having established that Crawford engaged in speech, the Court next concludes that Crawford's speech was Constitutionally protected. The United States Supreme Court and the United States Court of Appeals for the Sixth Circuit have articulated the boundaries of Constitutionally-protected speech to which this determination hews. First, "[t]he First Amendment protects the speech of employees only when it involves "matters of public concern."

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010) (quoting *Connick v. Myers,* 461 U.S. 138, 143 (1983)). If an employee is able to establish that her speech involved such a matter, a Court will then "balance . . . the interests of the teacher, as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 568 (1968). Finally, the public employee must establish that the statements she made were not made pursuant to her official duties, because "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

The parties do not contest that Crawford's abortion-related speech involves a matter of public concern—reproductive rights are plainly a topic of "political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Moving next to the balancing test articulated in *Pickering*, CSCC argues that the test favors Defendants because Crawford's asserted interest in posting "religious statements in opposition to abortion" is of less import than CSCC's interests in regulating the speech "as administrators." (ECF No. 71 at 20). But, as Crawford correctly points out, CSCC makes no attempt to articulate the way in which Crawford's statements on public bulletin boards impeded CSCC in efficiently performing its public service as an educational institution. *See Pickering*, 391 U.S. 563, at 568.

Finally, Defendants make only a minimal attempt to argue that Crawford's statements were made pursuant to his official duties. (*See* ECF No. 71). Some of Crawford's statements— such as the YouTube video about abortion (if it existed), the pre-2012 postings on bulletin boards

in classrooms, and the email referencing "ObamaCare"—may have involved classroom activities and may therefore not be protected speech. (ECF No. 78 at 9). But Defendants do not contest that much of the speech potentially at issue took place outside of the classroom, on public bulletin boards, and were made in Crawford's capacity as a private citizen.

### 2. An adverse action may have been taken against Crawford as a result of his protected speech.

The real friction between the parties' accounts occurs in the next prong of the inquiry—whether CSCC's denial of tenure to Crawford was taken *as a result of* his protected speech. To succeed on this claim, Crawford must ultimately prove that that his protected speech was a "substantial or motivating factor in the adverse employment action" by pointing to "'specific, nonconclusory allegations reasonably linking [his] speech to employer discipline.'" *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (first citing *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 584 (6th Cir.2000), then quoting *Famer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir. 2002)). In other words, Crawford must ultimately prove that his protected speech was the "but-for cause" of CSCC's decision to deny Crawford a full-time, tenure track position. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citing *Leonard v. Robinson,* 477 F.3d 347, 355 (6th Cir.2007). But at the summary judgment stage, Crawford need only demonstrate sufficient disagreement on the causal story as to require submission to a jury, and "in the First Amendment context, a defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury." *Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 308 (6th Cir. 2012).

Here, CSCC contends that the accumulated evidence reflects that Baretto was selected through a legitimate, competitive search process involving a faculty committee, any one of

whom "could have lobbied for Crawford to be interviewed, but did not." (Doc. 71 at 22). Furthermore, they argue, the decision reached by the committee was endorsed by a CSCC Dean and Associate Dean after their own independent interview with Baretto. (*Id.*) It is simply not plausible, the argument goes, that but for the abortion-related public postings, CSCC would have hired Crawford. (*Id.* at 20). There were instead several intervening causes that led to the decision, including the complaints from students about the YouTube video and the Obamacare email, and the administrators' belief that Crawford intimidated students into signing a hiring petition on his behalf, and the allegation that Crawford had discriminated against minority and international students. In any event, they note, Crawford's insistence that the student petition was unjustly held against him undercuts the argument that his protected postings were the but-for cause of CSCC's failure to hire him for a full-time position. (*Id.* at 27).

But in Crawford's narrative, Defendants had had animus toward him since he began posting political and religious materials in the classroom and on outside bulletin boards. (Doc. 74 at 48). Even after he stopped posting in classrooms, in his view, the animus continued, and was reflected in a series of adverse actions against him prior to CSCC's decision not to hire him. And though those incidents at the time did not lead CSCC to take adverse action against him, taken together they may be "relevant at trial to show a pattern of mistreatment on the job based on plaintiff's protected activities." *Dye*, 702 F.3d 286 at 305. That that mistreatment was based on protected speech is, in Crawford's telling, corroborated by Hailu and Schneider's contemporaneously-expressed concerns over Crawford's abortion-related speech. Furthermore, Crawford argues that the intervening causes CSCC identifies are disingenuous. He contends that he never showed any of his classes a YouTube video about abortion, and that the email referencing ObamaCare merely reflected the rationale for capping tutoring hours that Hailu had

16

given him. (Nov. 6, 2017, Mot. to Dismiss Hr'g Tr. ("Hr'g Tr.")). As for the student petition, Crawford argues, convincingly, that it strains credulity to believe that the administrators would have denied him a full-time position on this basis when not a single administrator appears to remember the name of any student who claimed he or she had been intimidated by Hailu. (*Id.*) Similarly, Crawford argues that if Hailu and Schneider genuinely believed that Crawford had been discriminating against minority and international students, they would have launched an investigation. (*Id.*) But the CSCC administrators did not. (*Id.*)

The Sixth Circuit has recognized that "[t]he administration of [a public] university rests not with the courts, but with the administrators of the institution." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989) (citing *Megill v. Bd. of Regents of Fla.,* 541 F.2d 1073 (5th Cir.1976)). As a result, officials may "review a professor's classroom activities when determining whether to grant or deny tenure," *id.*, and may choose not to elevate to a tenured position a professor whose "pedagogical attitude and teaching methods do not conform to institutional standards," *see id*. CSCC's contention that it has "the right to direct Crawford to limit his communications to his students to appropriate matters" (ECF No. 71) is accurate: "The First Amendment concept of academic freedom does not require that a nontenured professor be made a sovereign unto himself." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989) (citing *Lovelace v. Southeastern Mass. Univ.,* 793 F.2d 419, 426 (1st Cir.1986)).

But CSCC does not have the right to retaliate against Crawford for exercise of his First Amendment rights. The Sixth Circuit has "note[d] that proof of an official's retaliatory intent rarely will be supported by direct evidence of such intent. Accordingly, 'claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition.'" *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998) (internal citation omitted) (alteration in original) (first citing

*McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979), then quoting *Curtis v. Story*, No. 87–5988, 1988 WL 125361, at *3 (6th Cir. Nov. 25, 1988)). And given this jurisprudential backdrop, Defendants have not presented enough evidence such that a reasonable juror would have no choice but to find that that CSCC's decisions were based on any of the putative intervening causes CSCC identifies—or on any other legitimate basis—rather than on Crawford's protected speech.

Next, because Crawford demonstrated enough of a causal connection between the adverse action and the protected conduct to build a *prima facie* case, the burden of production shifts to the Defendants "to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citing *Sowards v. Loudon Cty.*, 203 F.3d 426, 431 (6th Cir. 2000). After the burden shifts, "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* (citing *Garvey v. Montgomery,* 128 Fed. Appx. 453, 459 (6th Cir. 2005)). But Defendants presented evidence of several legitimate, nonpolitical reasons for failing to hire Crawford. In addition to the intervening causes Defendants identified, it is also true that unlike Jeevan Baretto, Crawford had no recommendations from OSU professors, and no advocates on the faculty search committee. Even viewing all of the evidence in a light most favorable to Crawford, a reasonable juror could certainly credit these explanations and return a verdict for CSCC.

### 3.    Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978); *Wood v. Strickland*, 420 U.S. 308, 322 (1975)). Defendants' arguments that CSCC officials are entitled to qualified immunity are largely reiterations of their arguments on the merits: Because Crawford's First Amendment rights were not infringed, they argue, CSCC "may dismiss a nontenured professor for any reason, or no reason. . . ." (Doc. 71 at 24) (quoting *Parate v. Isibor*, 868 F.2d 821, 826 (6th Cir. 1989)).

But as this Court previously held at the Motion to Dismiss stage in this case, "[b]y August 2014, clearly established federal law held that public employers could not take adverse actions against their employees for exercising their right to speak on issues of public importance in circumstances closely analogous" to those alleged by Crawford. *Crawford v. Columbus State Cmty. Coll.*, 196 F. Supp. 3d 766, 779 (S.D. Ohio 2016) (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 574 (1968)). The remaining disagreement between CSCC and Crawford is not on the law of qualified immunity, but on the facts: CSCC contends that it did not take adverse action against Crawford for exercising his right to speak on issues of public importance, and Crawford obviously believes the facts at trial will show otherwise. Summary judgment on qualified immunity is therefore inappropriate.

## B. Age Discrimination Claim

### 1. There is no preclusion under the ADEA

At Summary Judgment, Defendants argued that the Age Discrimination in Employment Act (ADEA) precludes Crawford from bringing an age discrimination claim grounded in § 1983. As this Court observed then:

> Although Defendants find support in a number of appellate decisions which hold that the ADEA *does* preclude age-discrimination claims under the Fourteenth Amendment, the Sixth Circuit has never addressed this issue, and a recent opinion from the Seventh Circuit persuasively held that the ADEA does *not* preclude such claims. In the absence of binding authority from the Supreme Court or the Sixth Circuit, this Court will follow the well-reasoned opinion in *Levin v. Madigan*, 692 F.3d 607 (7th Cir.2012), in holding that the ADEA does not foreclose Crawford's constitutional age-discrimination claim.

*Crawford*, 196 F. Supp. 3d 766 at 780.   Plaintiffs have not brought to this Court's attention any new law—in the Sixth Circuit or otherwise—that might cause the Court to change its considered opinion.

### 2.      Crawford has not stated an age discrimination claim

But although Crawford may not be *legally* precluded from bringing an age discrimination claim under § 1983, he does not have a sufficient evidentiary basis on which a jury could reasonably find that he was, in fact, discriminated against based on his age.

The Sixth Circuit has not yet had the opportunity to consider an age discrimination claim under § 1983.  And although the parties use different language to describe the legal standard that would govern such a claim, they appear to agree that it would be appropriate to take guidance from the *McDonnell-Douglas* framework. (ECF No. 71 at 26; ECF No. 74 at 57).   Under that framework, the Plaintiff must first establish a *prima facie* case of age discrimination by showing: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema*

*N.A.,* 534 U.S. 506 (2002)). If Plaintiff is able to so establish, the burden of production shifts to the Defendants to offer a legitimate, nondiscriminatory reason for the adverse action." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572 (6th Cir.2000)). Finally, the burden shifts to Plaintiff to show that the articulated reasons are pretextual by showing that the reasons: (1) have no basis in fact; (2) did not actually motivate the actions; or (3) were insufficient to warrant the actions." *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994).

Defendants concede that Crawford "meet[s] the relatively low hurdle of stating a *prima facie* case of disparate treatment." (ECF No. 72 at 33–34). The next question is whether CSCC's asserted reasons for hiring Baretto were pretextual. CSCC identifies the following reasons for the hiring decision:

> Baretto had a strong recommendation from an Associate Dean at OSU's engineering program. Crawford had no such recommendation. Kent Fisher thought Baretto was "excellent" in his interview and would work well with students in CSCC classes. Crawford had been admonished by his Department Chair for inappropriate political statements to students in Physics and Engineering classes, and was called "insubordinate" by Hailu in September 2013 for going around his Lead Instructor and Chair to talk to a Vice President about CSCC curriculum.

To succeed on his claim, Crawford must put forth evidence that CSCC did not "honestly believe" those reasons for hiring Baretto. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citing *Smith v. Chrysler,* 155 F.3d 799, 806–07 (6th Cir.1998)).

Importantly, neither Hailu nor any other CSCC employee ever made any comment to suggest that they viewed Crawford's age in a negative light. (Crawford Dep. 88, 89, 189, 240). In *Woythal v. Tex-Tenn*, the Sixth Circuit determined that questions posed to an employee about his plans for retirement were not a sufficient basis to conclude that the employer discriminated against the employee based on his age. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir.

1997).  Here, as in *Woythal*, Crawford has not shown that anyone at CSCC made any direct references to his age at all.

But Crawford claims that, despite this dearth of evidence, the hiring process was so obviously flawed that a jury could conclude that CSCC's proffered reasons were pretextual.  He makes two arguments to this effect:  First, he argues that his own academic qualifications were so substantially superior to Baretto's that a jury could properly infer discrimination.  The Sixth Circuit has held that "when qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation. . . . A laxer standard would move this court form its proper role of preventing unlawful employment practices to the illegitimate role of acting as a 'super personnel department,' overseeing and second guessing employers' business decisions." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627–28 (6th Cir. 2006) (quoting *Verniero v. Air Force Acad. Sch. Dist. No. 20,* 705 F.2d 388, 390 (10th Cir.1983)).  Crawford's evidence as to his own qualifications is therefore insufficient: for the hiring committee to ascribe particular import to Baretto's excellent interview and his OSU connections is not so obviously an incorrect decisional process that one could only conclude that CSCC failed to make a "reasonably informed and considered decision."  *Id.* (quoting *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998).

Second, Crawford argues that CSCC's "manipulation of the hiring process" is strong evidence that any reasons CSCC offers for hiring Baretto were pretextual.  This argument, too, is unavailing.  Although it is true that failure to follow internal procedures can sometimes be evidence of pretext, *see, e.g.*, *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993), in the Sixth Circuit "an employer's failure to follow self-imposed regulations or

procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) (citing *Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C.Cir.1996); *Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir.1995)). In any case, Crawford does not sufficiently establish that CSCC's departure from policy indicates any kind of manipulation of the hiring process to prefer a particular candidate. The Court therefore **GRANTS** Defendant's Motion for Summary Judgment as to the age discrimination claim.

### C. Crawford's Claims Against CSCC President Harrison

Finally, the Court finds that Crawford's claims against CSCC President Harrison should be dismissed.

There is no doctrine of vicarious liability under § 1983. *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (citing *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 122 (1992)). Therefore, suit against individual actors under the statute "must demonstrate that the actor 'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself [or herself]." *Id.* (citing *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999)) .

Crawford had alleged that Harrison "communicated" with Defendants Schneider and Hailu, but no witness has testified that such communication ever took place. Crawford asks this Court to infer, based on Harrison's position, that she would have been aware of the complaints against Crawford and that she would have approved of the hiring of Baretto. (ECF No. 74 at 53–55). But even if the Court were to draw those inferences, there is not an iota of evidence that Harrison implicitly authorized any actual *misconduct*. There is therefore no evidentiary basis upon which a jury could reasonably hold President Harrison accountable. The Court therefore **GRANTS** CSCC's Motion for Summary Judgment as it pertains to Crawford's claims against President Harrison.

### IV. CONCLUSION

The Court **DENIES** CSCC's Motion for Summary Judgment as to Crawford's First Amendment Retaliation claim, **GRANTS** CSCC's Motion for Summary Judgment as to Crawford's Age Discrimination claim, and **GRANTS** CSCC's Motion for Summary Judgment as to Crawford's claims against CSCC President Harrison.

**IT IS SO ORDERED.**

_____s/Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  November 21, 2017**